1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

GARY J. KLUG,

        Plaintiff,

    v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

        Defendant.

Case No. 2:17-cv-01801-JAD-EJY

**REPORT AND RECOMMENDATION**

Re: Motion for Reversal and Remand
(ECF No. 17)

10

11

12

13

14

     Plaintiff Gary J. Klug ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner" or the "Agency") denying his application for disability insurance and supplemental security income ("SSI") under Title XVI of the Social Security Act. For the reasons stated below, the Commissioner's decision should be affirmed.

15

## I.      BACKGROUND

16

17

18

19

20

21

22

23

     On October 29, 2013, Plaintiff filed an application for SSI alleging disability. Administrative Record ("AR") 188–96. The Commissioner denied Plaintiff's claims by initial determination on May 20, 2014, and again upon reconsideration on August 12, 2014. AR 125–29. On October 7, 2014, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 142–45. After conducting a hearing on November 16, 2015 (AR 37–76), ALJ Barry Jenkins determined Plaintiff was not disabled on January 13, 2016 (AR 17–36). On March 10, 2016, Plaintiff requested the Appeals Council review the decision by the ALJ. AR 185. The Appeals Council denied Plaintiff's request for review on April 28, 2017. AR 1–6. This civil action followed.

24

## II.     STANDARD OF REVIEW

25

26

27

28

     The reviewing court shall affirm the Commissioner's decision if the decision is based on correct legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted).  In reviewing the Commissioner's alleged errors, the Court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusions." *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986).

"When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion." *Batson*, 359 F.3d at 1198 (citing *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995)).  A reviewing court, however, "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision." *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006) (internal citation omitted).  Finally, the court may not reverse an ALJ's decision based on a harmless error.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (internal citation omitted).  "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

## III.    DISCUSSION

### A.    <u>Establishing Disability Under The Act</u>

To establish whether a claimant is disabled under the Social Security Act (the "Act"), there must be substantial evidence that:

> (a)    the claimant suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months; and
>
> (b)    the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.

*Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).  "If a claimant meets both requirements, he or she is disabled." *Id*.

The ALJ employs a five-step sequential evaluation process to determine whether a claimant is disabled within the meaning of the Act.  *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. § 404.1520(a).  Each step is potentially dispositive and "if a claimant is found to be 'disabled' or 'not-disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*,

180 F.3d at 1098; 20 C.F.R. § 404.1520.  The claimant carries the burden of proof at steps one through four, and the Commissioner carries the burden of proof at step five.  *Tackett*, 180 F.3d at 1098.

The five steps are:

Step 1.  Is the claimant presently working in a substantially gainful activity?  If so, then the claimant is "not disabled" within the meaning of the Social Security Act and is not entitled to disability insurance benefits.  If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one and the evaluation proceeds to step two.  *See* 20 C.F.R. § 404.1520(b).

Step 2.  Is the claimant's impairment severe?  If not, then the claimant is "not disabled" and is not entitled to disability insurance benefits.  If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two and the evaluation proceeds to step three.  *See* 20 C.F.R. § 404.1520(c).

Step 3.  Does the impairment "meet or equal" one of a list of specific impairments described in the regulations?  If so, the claimant is "disabled" and therefore entitled to disability insurance benefits.  If the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, then the claimant's case cannot be resolved at step three and the evaluation proceeds to step four.  *See* 20 C.F.R. § 404.1520(d).

Step 4.  Is the claimant able to do any work that he or she has done in the past?  If so, then the claimant is "not disabled" and is not entitled to disability insurance benefits.  If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step four and the evaluation proceeds to the fifth and final step.  *See* 20 C.F.R. § 404.1520(e).

Step 5.  Is the claimant able to do any other work?  If not, then the claimant is "disabled" and therefore entitled to disability insurance benefits.  *See* 20 C.F.R. § 404.1520(f)(1).  If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do.  There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can do: (1) by the testimony of a vocational expert [("VE")], or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2.  If the Commissioner meets this burden, the claimant is "not disabled" and therefore not entitled to disability insurance benefits.  *See* 20 C.F.R. §§ 404.1520(f), 404.1562.  If the Commissioner cannot meet this burden, then the claimant is "disabled" and therefore entitled to disability benefits.  *See id.*

*Id*. at 1098–99.

**B.    Summary of ALJ's Findings**

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since October 29, 2013, the date the application was filed.  AR 22.  At step two, the ALJ found that Plaintiff suffered from disorders of the cervical and lumbar spine, which are medically determinable

1    severe impairments.  *Id*.  At step three, the ALJ found that Plaintiff's impairment did not meet or

2    equal any "listed" impairment in 20 C.F.R., Part 404, Subpart P, Appendix 1.  AR 23.

3    In preparation for step four, the ALJ found that Plaintiff has the residual functional capacity

4    ("RFC")[1] to:

5    > [P]erform light work as defined in 20 C.F.R. § 416.967(b).[2]  Specifically, the
   > claimant could lift and/or carry ten pounds frequently, twenty pounds occasionally;

6    > he could sit for six hours out of an eight-hour workday; he could stand and/or walk
   > for six hours out of an eight-hour workday; he could do all postural activities

7    > occasionally except he can never climb ladders, ropes or scaffolds; he could do
   > frequent but not continuous push/pull, reaching, fingers, and handling with the right

8    > upper extremity and foot controls with the right lower extremity; he must avoid
   > concentrated exposure to hazardous machinery, unprotected heights, and

9    > operational control of moving machinery; [Plaintiff] is able to perform at least
   > simple tasks typical of unskilled occupations and tasks with detailed instructions

10   > but he is unable to perform complex tasks.

11   *Id.*

12   In preparation for step five, the ALJ noted that Plaintiff was "born on May 18, 1961 and was

13   52 years old . . . on the date the application was filed.  Plaintiff subsequently changed age category

14   to closely approaching advanced age (20 C.F.R. 416.963)."  AR 27.  The ALJ noted that Plaintiff

15   had at least a high school education and is able to communicate in English.  *Id*.  The ALJ then added

16   that "[t]ransferability of job skills is not an issue because [Plaintiff] does not have past relevant work

17   (20 C.F.R. 416.968)."  *Id*.

18   At step five, the ALJ found that "[c]onsidering [Plaintiff's] age, education, work experience,

19   and residual functional capacity, there are jobs that exist in significant numbers in the national

20   economy that [Plaintiff] can perform (20 C.F.R. 416.969 and 416.969(a))."  *Id*.  Specifically, the

21   ALJ found Plaintiff could perform the "light, unskilled" occupations of "routing clerk," as defined

22   in the dictionary of occupational titles ("DOT") at DOT 222.687-022, "cashier, DOT 211.462-011,"

23   "mail clerk, DOT 209.687-026," "light duty ticket taker, DOT 344.667-010," and "sales clerk in a

24

---

25   [1]    "Residual functional capacity" is defined by the regulations as "the most you can still do despite your

26   limitations."  20 C.F.R. § 416.945(a)(1).

27   [2]    "Light work" is defined under the Social Security Regulations as work that involves "lifting no more than 20
    pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted

28   may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting
    most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).

mall kiosk, DOT 211.462-010." AR 28. The ALJ based his decision on the testimony of the vocational expert at the administrative hearing, and further determined that the vocational expert's testimony was consistent with the information contained in the DOT. *Id*.

After finding "[Plaintiff] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy," the ALJ concluded that "[a] finding of not disabled is . . . appropriate under the framework of the above-cited rules." *Id*. (internal quotation marks omitted). The ALJ, therefore, found "[Plaintiff] has not been under a disability, as defined in the Social Security Act, since October 29, 2013, the date the application was filed (20 C.F.R. 416.926(g))." *Id*.

## C.    Summary of Medical Evidence

### 1.    Radiological Examinations and Findings

On October 7, 2011, Dr. Richard Cestkowski, a physiatrist, performed a physical examination of Plaintiff and found that "[Plaintiff] is alert, cooperative, and well hydrated. He appears to be in no acute distress. Vital signs are stable. Affect is appropriate. He is oriented to person, place and time." AR 413. A neurological examination revealed "intact" cranial nerves II-XII; "intact" and "symmetrical" reflexes in the upper and lower extremities; "Babinski downgoing bilaterally"; "[n]o colonus"; "bilateral upper and lower extremity motor and sensory examination . . . within normal limits"; "Tinel's sign [was] negative at the wrists and elbows"; "no pronator drift"; and, that Plaintiff's "Rhomberg test [was] negative." *Id*. A musculoskeletal examination revealed "no pain" upon palpation of the cervical or trapezius musculature; "[n]o active cervical range of motion loss"; "no guarding"; "mild muscle spasms"; "[n]o cervical spinous process tenderness"; the "Spurling's sign [was] negative"; "pain [upon palpation of] the mid and lower thoracic as well as the mid and lower lumbar paraspinal muscles"; "mild muscle spasms appreciated with guarding to deep palpation"; "mild active thoracic and lumbar range of motion loss to all movements with pain noted at extremes"; and, that "the remainder of [Plaintiff's] musculoskeletal examination [was] within normal limits." AR 413–14. Dr. Cestkowski assessed: (1) "acute traumatic cervical/trapezius myositis"; (2) "acute traumatic thoracic myositis"; and, (3) "acute traumatic lumbosacral myositis." AR 414.

On February 16, 2012, Dr. George A. Ritter, a chiropractor, completed an initial examination/evaluation report of Plaintiff. AR 424. Dr Ritter then prepared a report diagnosing Plaintiff with "cervical sprain," "thoracic sprain," "lumbar sprain," "headache," "muscle spasm," "dizzyness [sic]," "facial pain," "chest pain," and "confusion." *Id*. Upon visual evaluation, Dr. Ritter noted "[Plaintiff's] carriage and gait displayed no difficulty," "[Plaintiff's] movements were moderately slow and guarded," and "there was no evidence of contusion of lasceration [sic]." AR 425. Dynamometer testing revealed potential "injury to the nerve roots of the cervical spine." AR 426. Plaintiff's "right face [was] swollen and painful"; "his right eye was half closed"; and, "he h[e]ld his head to the left and in an antalgic posture." *Id*. Plaintiff's cervical range of motion was decreased in all areas due to sharp pain. AR 427. X-ray findings revealed evidence of right muscle spasm in the cervical spine, evidence of left muscle spasm in the thoracic spine, and evidence of right muscle spasm in the lumbar spine. *Id*. A magnetic resonance imaging ("MRI") of Plaintiff's cranium, cervical spine, and thoracic spine showed "disc bulges at most of the vertebral levels." AR 428. Dr. Ritter opined that Plaintiff's prognosis was "guarded." *Id*. Dr. Ritter also noted that "seemingly all of the symptoms [Plaintiff] is experiencing in the head and neck are caused by displacement of the C1 vertebra. . . . When this vertebra is returned to its proper position via a chiropractic spinal adjustment, all his symptoms usually leave immediately." *Id*. Dr. Ritter stated that Plaintiff would undergo "treatment . . . consist[ing] of conservative chiropractic spinal correction, chiropractic physiotherapy and observation at the interval stated under 'treatment plan,' and decreasing in frequency as the [Plaintiff's] condition allows." *Id*.

On February 23, 2012, a MRI examination of Plaintiff's cervical spine revealed "posterior disc bulge and spur [] at the C2-3, C3-4, C-4-C5, and C5-6 levels"; "[e]arly disc degeneration" at the "C2-3, C3-4, and C4-5 levels with moderately advanced disc degeneration [at the] C6-7 [level]"; "[a]nomalous segmentation at the C3-4 level with fusion of the vertebral bodies and obliteration of the disc space;" and, "[f]oraminal narrowing . . . at [the] C4-5, C5-6, and C6-7 levels right greater than left." AR 336. An MRI of Plaintiff's thoracic spine revealed "[e]arly disc degeneration at the T6-7 level." AR 337. "Normal intervertebral disc height and hydration" were found at the T1-T2 through T5-T6 levels, as well as at the T7-T8 through T11-T12 level. *Id*.

6

On March 5, 2012, Dr. Cestkowski recommended a neurological consultation with Dr. Enrico Fazzini, a neurologist and osteopathic physician. AR 401. On March 8, 2012, Dr. Fazzini performed a neurological consultation. AR 338. In making his findings, Dr. Fazzini considered the following: (1) a CT scan of Plaintiff's brain taken on February 3, 2012, which was negative; (2) a MRI scan of Plaintiff's brain taken on February 23, 2012, revealing a "non specific T2 hyper intensity measuring 5mm in the mastoid region in the right temporal bone thought to represent a cholesteatoma or mastoiditis," and otherwise "negative for intracerebral abnormalities"; (3) a CT scan of Plaintiff's temporal bones and mastoids taken on March 5, 2012, which revealed a "right mastoid cholesterol granuloma of developmental etiology with localized inflammatory disease"; and, (4) MRI scans of Plaintiff's cervical spine and thoracic spine taken on February 23, 2012. *Id*. Plaintiff reported "having severe persistent headaches since the time of [an] accident" in which he was the driver in a vehicle that was struck twice in the rear. *Id*. Plaintiff complained of "cervical spine pain radiating into the head and into the right arm associated with numbness, tingling, and weakness in the right arm and hand." *Id*. Plaintiff "continued to complain of right temporal-orbital headaches." AR 339. Dr. Fazzini opined that "[Plaintiff's] [p]ast medical history was unremarkable for prior or subsequent injuries or conditions affecting the cervical spine or head." *Id*. A physical examination by Dr. Fazzini revealed that Plaintiff is "a well-developed male in moderate distress because of the symptoms. Examination of the head, ears, eyes, nose, and throat, and extremities was without any obvious signs of trauma." *Id*.

A neurological examination by Dr. Fazzini revealed that Plaintiff had "weakness in the right brachioradialis and handgrip," "intact" gait, "[p]lantar response was flexor bilaterally," "absent" atrophy, and "normal" muscle tone; "[s]ensation to pinprick was diminished in the right C5, C6 levels, and C7 distribution," "normal" vibration sensation; "[d]eep tendon reflexes were graded as 2/4 and were bilaterally symmetrical except for a reduced left biceps and brachioradialis response," and "deep tendon reflexes were diminished on the left side even though the patient's numbness and weakness was on the right." *Id*. A spine examination "revealed moderate paraspinal muscle spasms and tenderness in the cervical and dorsal spine regions more on the right than on the left"; "[c]ervical

spine ranges of motion were reduced as follows: flexion 25/50, extension 30/60, right and left rotation 40/80 and 60/80, and right and left lateral bending 20/45 and 30/45"; and, "[e]xamination of the knees and shoulders were intact."  *Id*.

Dr. Fazzini performed electromyogram/nerve conductive ("EMG/NCV") tests on Plaintiff's upper extremities, revealing "denervation present in the muscles supplied by the C6-7 nerve roots." *Id*.  Dr. Fazzini's impression was that Plaintiff suffers from: (1) "[c]ervical myofascial pain syndrome with central disc protrusions and radiculopathy"; (2) "[c]ervical occipital neuralgia"; (3) "[p]ostconcussive headache syndrome with migraine component"; and, (4) "[r]ight temporal mastoid cholesteatoma, which may be in part responsible for headaches."  AR 339–40.  Dr. Fazzini opined that Plaintiff remained "moderately disabled as a direct consequence of the injuries sustained in the motor vehicle of 09/30/11."  AR 340.  On March 21, 2012, Dr. Cestkowski recommended that Plaintiff not stand for more than ten minutes at one time because of his cervical and thoracic pain. AR 395.

On April 9, 2012, Dr. Cestkowski completed a discharge summary at Plaintiff's request.  AR 350.  "[Plaintiff] was advised by neurology and orthopedic surgery to have further evaluation and treatment.   However, secondary to insurance issues he was not going to pursue those recommendations currently."  *Id*.  On the same day, Dr. Ritter found Plaintiff's cervical ranges of motion "mildly restricted in all planes", a maximal compression test for cervical nerve root compression was "positive"; Spurling's test was "positive;" foramina compression test was "positive"; cervical distraction test was "positive"; and, "tissues [were] tender to palpation and [were] congested."  AR 446–47.  Although "[Plaintiff's] severe symptoms were able to be treated with great results . . . , [Dr. Ritter noted] these results are not permanent at this time."  AR 447. Accordingly, Dr. Ritter "recommend[ed] Plaintiff continue a regimen of [chiropractic] treatment." *Id*.

On July 18, 2013, Plaintiff's chest x-ray revealed "clear" lungs and "[n]o active disease." AR 507.  On September 24, 2013, Plaintiff "arrived to the emergency room complaining of a flare [up] in his seasonal allergies."  AR 538.  A physical examination performed by the emergency room

staff at St. Rose Dominican Hospital—San Martin Campus revealed "normal" cranial nerves II-XI, "no maxillary facial pain to palpation," and otherwise unremarkable results.  *Id*.  Plaintiff was "discharged home with his mother in no acute distress, in stable condition."  AR 539.

On March 19, 2014, Plaintiff's chest x-ray revealed "clear" lungs, "[n]o pleural effusions," "[n]o pneumothorax," "normal" heart size, "normal" pulmonary vascularity, "normal" mediastinal contour, "no hilar or mediastinal lymphadenopathy," and "normal" visualized thoracic spine and ribs.  AR 518.  On March 20, 2014, Plaintiff reported to University Medical Center "complaining of chronic neck pain."  AR 513.  At this visit, Plaintiff told Dr. Jason Jones, an emergency care physician, that Plaintiff's medication "Imitrex always helps his neck and head pain.  He denies any change in his symptoms."  *Id*.  A physical examination by Dr. Jones showed "bilateral equal strength"; "nonfocal neurologic exam"; "[n]ormal mood and affect"; and, "no significant change."  *Id*.  Dr. Jones opined that "[Plaintiff] can be discharged home."  *Id*.  On March 21, 2014, a computerized tomography ("CT") scan was negative for fracture or static subluxation of the cervical spine.  AR 527.

On May 27, 2014, a musculoskeletal examination by Plaintiff's treating physician Dr. Jeffrey Evenson, an internal medicine specialist, revealed "[n]o cyanosis, clubbing, or edema" in Plaintiff's extremities.  AR 830.  Plaintiff had "[n]ormal" range of motion, "[n]o gross deformities", and "[e]xamination of Plaintiff's back reveal[ed] a normal curvature of the spine, full range of motion, no misalignment or tenderness, normal stability, and normal strength and tone." *Id*.

On May 30, 2014, Dr. Morton I. Hyson, a neurologist, completed a motor examination of Plaintiff and found "normal" tone, bulk, and strength, and "2+ and symmetrical" deep tendon reflexes.  AR 753.  The sensory examination revealed diminished pinprick sensation of both lower extremities.  *Id*.  Dr. Hyson diagnosed Plaintiff with cervical disk disease, lumbar disk disease, rule out neuropathy versus radiculopathy, and cephalgia.  *Id*.

On June 2, 2014, Dr. David Harbrecht, an otolaryngologist, examined Plaintiff for "dizziness/vertigo."  AR 877.  Dr. Harbrecht diagnosed Plaintiff with "[c]holesteatoma," "[d]eviated [n]asal [s]eptum," "[h]ypertrophy of [n]asal [t]urbinates," "[p]eripheral [v]ertigo," "[s]ensorineural [h]earing [l]oss," "[h]eadache," "[c]ervicalgia," and "Hepatitis B."  AR 880.  On June 11, 2014, a

9

cervical spine series done by Steinberg Diagnostic Medical Imaging Centers showed "[p]robable previous fusion" at the C3-C4 level; "[d]egenerative disk disease" at the C4-C5, C5-C6, and C6-C7 levels; "[m]ultilevel degenerative facet arthropathy"; and, "[s]table osseous relationships maintained with flexion and extension."  AR 759.  A lumbar spine x-ray series showed "[n]o evidence of abnormal motion with flexion or extension"; "[m]ild facet arthropathy lumbosacral junction"; and, "[a]therosclerotic vascular disease."  AR 760.  A thoracic spine x-ray series revealed "[m]ultilevel degenerative disc disease," and "[n]o compression fracture."  AR 761.  A MRI examination of the cervical spine revealed a "normal cervical lordosis"; "mild mid cervical spondylosis"; "[d]egenerative changes . . . at the C5-C6 level with mild annular bulging slightly eccentric to the right indenting the ventral thecal sac"; "no significant canal stenosis"; "[p]osterior facet and uncinate arthropathy contribut[ing] to mild bilateral neural foraminal narrowing"; "prominent right-sided uncinate arthropathy contribut[ing] to mild to moderate right neural foraminal narrowing without significant canal stenosis" at the C4-C5 levels; "mild degenerative changes at the C6-C7 level"; and, "unremarkable" remaining levels.  AR 762.  A MRI examination of the thoracic spine performed at the same time revealed "no significant disc bulge/hesitation"; "no evidence [of] central canal stenosis"; and, "patent" foramina.  AR 764.

On June 26, 2014, EMG/NCV examinations by Dr. Hyson showed "evidence consistent with a right carpal tunnel syndrome."  AR 742.  "Otherwise, [this was a] normal electrodiagnostic stud[y] of [Plaintiff's] upper and lower extremities."  *Id*.  Dr. Hyson diagnosed Plaintiff with "cervical disc disease," "lumbar disc disease," and "rule out neuropathy versus radiculopathy."  AR 751.

On July 23, 2014, Plaintiff reported to Dr. Harbrecht that he has "trouble hearing when there's a lot of background noise."  AR 860.  "Plaintiff also stated that his ears still feel plugged on/off."  *Id*.  The medical notes also reflect that Plaintiff stated "he has not had any dizzy spells since last visit[, and that] . . . his eyes are feeling fine."  *Id*.

On August 25, 2014, Dr. Joaquim Tavares, a pulmonologist, diagnosed Plaintiff with "[m]ild [s]leep [a]pnea [s]yndrome."  AR 867.  On August 29, 2014, Dr. Edgar Evangelista, a neurologist, completed a motor examination of Plaintiff and found "normal" neck flexion and extension, muscles with "normal" bulk and tone, "[n]o evidence of fasciculation," "[n]o pronator drift," and "motor

strength [of] 5/5 all over." AR 847.  A sensory examination by Dr. Evangelista revealed Plaintiff was "[i]ntact to light touch, pinprick, joint position sense [], and vibration." *Id*.  Plaintiff had "no ataxia or dysmetria of the upper and lower extremities.  The finger to nose, hand rapid alternating movement and heel to shin test are intact bilaterally." *Id*.  Plaintiff had "symmetrical" deep tendon reflexes and "plantar responses [were] flexor bilaterally." *Id*.  Dr. Evangelista reported that Plaintiff's Rhomberg test was "[n]egative," and his tandem, toe and heel walking were "[i]ntact." *Id*.  Dr. Evangelista diagnosed Plaintiff with "[h]eadaches," "[m]emory loss," "[i]nsomnia," "[c]ervicalgia," "pain in limb," "lumbago," and "disturbance of skin sensation." *Id*.

On September 19, 2014, Dr. Evangelista performed an EMG/NCS test of Plaintiff revealing "evidence of bilateral moderate sensorimotor median mononeuropathies (carpal tunnel syndrome) without ongoing denervation or reinnervation"; "mild ulnar mononeuropathy across the elbow without denervation"; "[p]rolonged left peroneal latency with reduced amplitude [that] may be due to a peroneal neuropathy across the knee or prior lumbosacral radiculopathy"; "[n]o evidence [of] a peripheral neuropathy"; and, "plexopathy ongoing radiculopathy or myopathy." AR 849.

On October 17, 2014, Plaintiff reported to Dr. Harbrecht that "he has not had any dizzy spells since last visit.  [Plaintiff] states his ears are feeling fine." AR 860.

On November 1, 2014, "Plaintiff's gait pattern show[ed] the use of a straight cane in [Plaintiff's] right [upper extremity]." AR 912.  Plaintiff showed "decreased heel strike and toe off phases with some increased hip external rotation," bilateral "guarding at his hips with limited forward flexion," and "a slightly shortened stride length." *Id*.

On March 11, 2015, an MRI revealed "[d]egenerative changes in Plaintiff's cervical spine"; "no significant spinal canal stenosis"; "moderate to severe right neuroforaminal stenosis" at [the] C5-6 and C4-5 levels"; and, "interbody fusion at the C3-4 level." AR 887–88. On March 18, 2015, a lumbar spine discogram revealed "[n]o pain" and "[n]ormal disk[s]" at the L3-4 through the L5-S1 levels. AR 1099–1100.

On May 7, 2015, a physical examination revealed Plaintiff's cranial nerves II-XII were "normal." AR 897. Plaintiff had "normal" neck flexion and extension, muscles with "normal bulk and tone," "[n]o evidence of fasciculation," '[n]o pronator drift," and motor strength was "5/5 all

over." *Id.* The sensory examination of Plaintiff showed he was "[i]ntact to light touch, pinprick, joint position sense (propnoception) and vibration"; did not have "ataxia or dysmetria of the upper and lower extremities. The finger to nose, hand rapid alternating movement and heel to shin test [were] intact bilaterally"; "[d]eep tendon reflexes [were] symmetrical and 2+ throughout. Plantar responses [were] flexor bilaterally"; and, Plaintiff's Rhomberg test was "negative," with "[i]ntact tandem, toe [and] heel walking." *Id.*

On November 29, 2015, Dr. Michael Seiff, a neurosurgeon, opined that Plaintiff experienced "50% relief" after undergoing three rounds of physical therapy for approximately 24 weeks and receiving multiple injections, with the most recent physical therapy session on May 29, 2015. AR 1149. Dr. Seiff suggested that Plaintiff's pain may have been exacerbated when a nerve appeared to be contacted during injection. *Id.* Dr. Seiff diagnosed Plaintiff with "[s]pinal stenosis" and "[r]adiculopathy" in his cervical region. AR 1151. Plaintiff and Dr. Seiff discussed "multiple options," including "single and multilevel ACDF [anterior cervical discectomy and fusion] or posterior cervical decompression, as well as continued nonsurgical options. In the end [they] decided to proceed with a 2 level ACDF at C4-5 and C5-6." *Id.*

On December 28, 2015, Dr. Nianjung Tang, a physical medicine and rehabilitation specialist, indicated that Plaintiff is a good candidate for repeat right C5-6 and C5-6 transforaminal epidural steroid injections ("TFESI"). AR 1152.

### 2. Emergency Treatment Records

Between October 2011 and March 2014, Plaintiff visited the emergency department multiple times for headaches, cervical radiculopathy, shortness of breath, chest pain, and allergic rhinitis. AR 680–724. These visits are discussed above.

### 3. Treating Source Statement

Dr. Evenson has been treating Plaintiff for low back pain and neck pain since 2010.[3] AR 810. On July 29, 2014, Dr. Evenson filled out a physical medical source statement in which he relied

---

[3] In his Motion for Reversal and Remand, Plaintiff states that "Dr. Evenson and his treatment team at HealthCare Partners Medical Group have treated Klug *since April 2014* for headaches, neck pain and lumbar strain." ECF No. 17 at 14:15–17 (emphasis added) (internal citations omitted). Irrespective of the discrepancy between Dr. Evenson's self-reported length of contact and Plaintiff's reports, the Court treats Dr. Evenson as a treating physician in its analysis.

on x-rays, tenderness upon examination, and clinical findings. AR 810–13. Dr. Evenson found Plaintiff was completely incapable of any sitting or standing, and was required to walk around every five minutes for ten minutes at a time during an 8-hour working day. AR 811. Dr. Evenson checked boxes indicating that Plaintiff can sit and stand or walk less than two hours total in an eight-hour working day; "need[s] a job that permits shifting positions at will from sitting, standing, or walking"; and must take unscheduled breaks during a working day. *Id*. Dr. Evenson opined that Plaintiff's legs needed to be elevated horizontally 100% of the time; that Plaintiff was incapable of lifting any weight, or twisting, stooping, crouching, squatting, or climbing; incapable of performing any grasping, turning, handling, or reaching; and, incapable of even "low stress" work. AR 812–13. Dr. Evenson checked boxes indicating that Plaintiff would likely be "off task" at least 25 percent or more of a typical workday; Plaintiff is "[i]ncapable of even 'low stress' work"; Plaintiff's impairments are not likely to produce "good days" and "bad days"; and, assuming Plaintiff was trying to work full time, he is likely to be absent from work "[m]ore than four days per month" as a result of his impairments or treatment. AR 813. Dr. Evenson also diagnosed Plaintiff with depression and anxiety. *Id*.

In his November 14, 2015 letter to the Court, Dr. Evenson noted Plaintiff could only lift a maximum of ten pounds, cannot bend over, cannot raise his arms to chest level or above head without experiencing extreme pain, cannot use stairs, cannot walk more than 100 feet without severe pain, can sit for a total of five minutes and stand for a total of ten minutes, and cannot walk up incline walk ways. AR 1138.

**D.   Plaintiff's Symptom Testimony**

On examination by ALJ Jenkins during the November 16, 2015 administrative hearing, Plaintiff testified that he works as a live-in caregiver for an elderly woman named Dorothy Martin. AR 42. Plaintiff testified that he works as Ms. Martin's caregiver "because of things she needed to do around the house that she couldn't do physically . . . heavy lifting and stuff like that." *Id*. Plaintiff worked "odd jobs, painting, handy man work, laborer type of work . . ." in 2006 and 2007. AR 43. Despite working full-time, Plaintiff "pretty much didn't make anything." *Id*. Plaintiff has not worked since 2007, because his "father grew ill and [Plaintiff] was taking care of him . . . , so [he]

had to quit [his] business to take care of [his father]." AR 44. Thereafter, Plaintiff reports that he "tried to get back on [his] feet again and it was really hard. . . .  [Plaintiff] did some landscaping, . . . . some painting here and there but nothing substantial." *Id*. Based on this testimony, ALJ Jenkins found no past relevant work. *Id*.

Plaintiff testified that the "sharp pain in [his] back, [his] neck, [his] arms" prevent him from working. AR 44. Plaintiff clarified that the pain originates from his "mid-spine," and not his "lower" back. AR 45. Plaintiff testified that his "memory loss" also prevents him from working. *Id*. According to Plaintiff, no physician has diagnosed a medical or psychological problem that may contribute to Plaintiff's memory loss. *Id*. Plaintiff and his counsel confirmed that there is no medical evidence to support Plaintiff's allegations of memory loss. AR 45–46. Plaintiff uses a cane to go up inclines because otherwise he would "fall over backwards." AR 46. Plaintiff "can't seem to grasp anything." *Id*. Plaintiff regularly experiences decreased strength and loss of balance. *Id*. Plaintiff drives "maybe twice" per week, although he cannot drive for long because he experiences pain in his right thigh, hand, and foot. AR 46–48. Plaintiff can cook for himself, does his own laundry, and can wash "[l]ike one dish. . . ." AR 46–47. Plaintiff cannot vacuum, sweep, or mop. AR 47.

On examination by his attorney, Plaintiff testified that he "only drive[s] two out of seven days a week" because "there's nowhere to go, [he doesn't] have any social life." *Id*. Plaintiff experiences problems with his handwriting after a car accident he had sometime in 2011. AR 48. Plaintiff has problems adding, subtracting, multiplying, and dividing. AR 49. At the time of the administrative hearing, Plaintiff had an upcoming surgery appointment for his neck. *Id*. Plaintiff "drops things and sometimes his [hands and wrists] will . . . jerk. AR 50. Although Plaintiff's physicians ordered wrists braces for him, Plaintiff cannot afford them. *Id*. Plaintiff experiences "extreme headaches . . . all the time." *Id*. Plaintiff experiences a migraine headache "every couple of days or so," whereupon he "get[s] really sick to [his] stomach . . . and then . . . [he has] to lay down." AR 50–51. Plaintiff alternates between standing and sitting, because when "[he's] sitting it hurts [his] back, . . . and sometimes when [he] stand[s] it helps to alleviate that pain." AR 51. Plaintiff can walk about half a block before he has to stop and rest. *Id*. Plaintiff can neither go up

14

nor down the stairs, because of vertigo and pain.  *Id.*  Plaintiff can reach his hand above his waist, albeit while experiencing "extreme pain."  AR 51.  Plaintiff can comfortably lift and carry "five, five-ten pounds at most."  AR 52.  Plaintiff cannot "get in a praying position on both knees or squat like a catcher on a baseball team and up again without help."  *Id.*  Plaintiff does not use a wheelchair or walker, brace, wrap, scooter, or TENs unit; instead, he ambulates with a cane.  *Id.*  Plaintiff's hands "always" feel "numb and tingly."  *Id.*  Plaintiff claims nothing makes his pains better.  AR 53.  Plaintiff testified that the medicine he is taking "sometimes" makes his pain worse.  *Id.*  "[G]oing to take a shower [and] any kind of physical exercise" makes Plaintiff's pain worse.  *Id.*  Plaintiff's pain wakes him up at night.  *Id.*  Plaintiff "basically lay[s] down most of the day;" "[s]ometimes [he] read[s] a book or watch[es] TV . . . there's nothing else that [he] can do."  AR 54.  Plaintiff naps one to two hours per day, and watches television or reads a book while lying down.  *Id.*  Plaintiff has problems shampooing his hair, getting dressed, and putting on shoes and socks.  *Id.*  Plaintiff reports no regular social activities outside of his house.  *Id.*  Plaintiff reports "a lot of constipation and a lot of stomach problems" as side effects from his medication.  AR 55.  Plaintiff reports "dizziness . . . about once every two, three days or so," lasting "[a]bout five minutes. . . ."  *Id.*  Plaintiff confirmed that he cannot walk up an incline because he falls over.  *Id.*  Plaintiff testified that these falling episodes occur at "any time."  *Id.*

On reexamination by ALJ Jenkins, Plaintiff testified that he did not work from 2008 to 2011 because he "was doing caregiving for friends . . . [he] didn't make any money on it."  AR 55–56.  When ALJ Jenkins asked Plaintiff why he did not "get a regular job," Plaintiff replied that "[he] just wanted to survive at that point. . . . [he] was just so happy to survive . . . ."  AR 56.  Plaintiff admits this may have been due to a "motivation problem" then, but denies having a motivation problem now.  *Id.*  Plaintiff claims he "really tried to get back in the workforce" after the Social Security Administration denied his disability insurance benefits application.  *Id.*  Plaintiff tried to work as a "salesman" at "Prudential, [he] went to a lot of other places . . . to try to get jobs," but because of "[his] background, [his] past, [he] couldn't get a job."  AR 57.

On reexamination by his attorney, Plaintiff testified that he had "trouble finding work . . . as an ex-felon."  *Id.*  Plaintiff went to prison for an armed robbery conviction sometime around 1981,

and he was released from prison in 1999. *Id*. Plaintiff has not been in prison at any other time; and, has not been in prison since his incarceration. AR 57–58. After his release from prison, Plaintiff "went through various vocational rehab [programs]," including "anger management," "pro-probation [sic]," and a "college-level class" to learn "computer" skills. AR 58.

**E.    Vocational Expert Testimony**

ALJ Jenkins asked VE Haney to assume a hypothetical individual that included, a person:

> of the Claimant's age, education, and experience, being capable of working at a light exertional level, all posturals occasional, except he could never climb ropes, ladders or scaffolds. He could frequently but not continuously use his right upper extremity for push/pull, he could frequently but not continuously use his right lower extremity for foot controls, he could reach frequently but not continuously with his right upper extremity, he could also finger, and handle, and feel frequently but not continuously with his right upper extremity. There are no limitations regarding his left upper extremity. He would need to avoid concentrated exposure to excessive noise, vibration, hazardous machinery, unprotected heights, and operational-control of moving machinery. He would be able to perform simple tasks typical of unskilled occupations, as well as understand, and follow, and carry out detailed instructions, but he would be unable to perform complex tasks. With those limitations, is there work at the light exertional level that such a person could perform?

AR 58–59. VE Haney testified that the foregoing hypothetical person could work as a "routing clerk," DOT 222.687-022; "cashier II," DOT 211.462-010; "mail clerk," DOT 209.687-026; and, "laundry worker," DOT 302.685-010. AR 60.

On examination by Plaintiff's attorney, VE Haney testified that the "routing clerk" position requires handling, reaching, and fingering altogether occasionally, handling frequently, reaching frequently, and nothing constantly.[4] AR 61–62. VE Haney testified that the "cashier II" position requires "frequent" levels of exertion on "everything." AR 62. VE Haney testified that the "laundry worker" position requires "occasional stooping" and "occasional fingering," but "constant . . .

---

[4]    VE Haney testified that the DOT defines "handling" as "seizing, holding, grasping, turning, or otherwise working with hand or hands, fingers, . . . only to the extent that they are an extension of the hand, such as to turn a switch or shift automobile gears." AR 66. VE Haney testified that the DOT defines "routing clerks" as people who:

> sort boxes, bundles, lots of articles for delivery, they read delivery or route numbers marked on articles or delivery slips or determines locations of addresses indicated on delivery slips using charts, places or stacks articles in bins designated according to route, driver, or type. May be designated according to workspace such as a conveyor belt package sorter, may sort stacks of mail and be known as a mail sorter for railroad transportation, an alternative title is route clerk, router.

AR 62.

reaching and handling." AR 63. ALJ Jenkins eliminated "laundry worker" as inconsistent with his hypothetical. *Id*. VE Haney testified that the "mail clerk" position requires "reaching, handling, and fingering . . . frequent[ly]."[5] AR 64. VE Haney testified that the "exact definition of frequent . . . is 1/3 to 2/3 of the day by DOT definition. . . . Occasional is 1/3 of the day, frequent is up to 2/3." *Id*. VE Haney testified that "all employment" would be eliminated if the hypothetical person were "off-task 15 percent of the time or more." AR 67. "All employment" would be eliminated if the hypothetical person "miss[ed] two [days] of work per month or more." *Id*. All three jobs VE Haney referenced would be eliminated if the hypothetical person were "only able to use bilateral hands for fingering, handling, and grasping occasionally" because of "bilateral carpal tunnel and neck problems." *Id*. The three occupations VE Haney referenced would be eliminated if a person would "only be able to stand . . . two of the eight work hours a day," because the occupations are "all light duty [work] and not sedentary." AR 68. VE Haney testified that "if someone could not walk any inclines," this would not eliminate nor substantially reduce the number of available occupations. *Id*.

On reexamination by ALJ Jenkins, VE Haney testified that a person who "could not stand for more than two hours could not [perform] these jobs," because they are "light duty" requiring "basically more standing. If it's less than that, you're basically talking sedentary." AR 68–69. VE Haney stated that, out of the jobs he referenced, only the cashier II occupation could be performed with a sit/stand option.[6] AR 69. Specifically, VE Haney responded that a "gas island cashier" job could be performed with a sit/stand option. AR 70. When the ALJ asked whether there are any "other jobs at the light exertional level that would be consistent with [his] hypothetical and include the sit/stand option[,]" VE Haney testified that the foregoing hypothetical person could work as a "light duty . . . ticket taker," DOT 344.667-010, and "sales clerk in a mall kiosk," DOT 211.462-

---

[5]    The AR is unclear at this point. VE Haney testified that the "mail clerk" position requires "reaching, handling, and fingering frequent, (INAUDIBLE) occasionally, it's all frequent, there's nothing constant on here." AR 64. The Court interprets VE Haney's testimony, in conjunction with the subsequent discussion of the definition of "frequent" under the DOT, as assigning a frequent exertional level all aspects of the mail clerk position.

[6]    ALJ Jenkins defined the "sit/stand option . . . as jobs where the person could sit or stand, alternating between the two positions and continue to work with the time needed in the position and the frequency of the position change at the sole discretion of the employee. . . ." AR 69.

010.  AR 70–71.  VE Haney testified that a person using a cane to ambulate would be able to work in any of the occupations discussed above, with the exception of routing clerk.  AR 72.

On reexamination by Plaintiff's attorney, VE Haney testified that the number of the additional jobs in the national economy would be significantly reduced if the hypothetical person could only occasionally reach, handle, and finger.  AR 73.  The VE testified that the DOT does not consider overhead reaching, and therefore, limiting the hypothetical person to "only reach[ing] to chest level and not go[ing] any higher" would have no impact on his ability to perform the occupations discussed in his testimony.  AR 73–74.

**F.    Issues Presented**

Plaintiff contends the ALJ's decision is not supported by substantial evidence because the ALJ erred by: (1) failing to articulate specific and legitimate reasons for rejecting the opinions of the treating sources, and (2) failing to articulate clear and convincing reasons for discounting Plaintiff's subjective complaints.  ECF No. 17 at 13:3–22:18.

**1.    The ALJ's Consideration of The Opinions of The Treating Sources**

In accordance with the Social Security regulations, the courts have "developed standards that guide our analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r Soc. Sec.*, 528 F.3d 1194, 1998 (9th Cir. 2008).  For claims filed before March 27, 2017, courts "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither treat nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  For cases falling under this rubric, "greater weight should be given to a treating physician's opinion because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citing *Sprague v. Brown*, 812 F.2d 1226, 1230 (9th Cir. 1987).  "While the opinion of a treating physician is thus entitled to greater weight than that of an examining physician, the opinion of an examining physician is entitled to greater weight than that of a nonexamining physician." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (internal citation omitted); *see also* 20 C.F.R. §§ 404.1527, 416.927.  If the treating physician's opinion on the nature and severity of the claimant's impairment is well-

supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the case record, it will be given controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Social Security Ruling ("SSR") 96-2p (same).

"If a treating or examining doctor's opinion is contradicted by another doctor's opinion, the ALJ may only reject it by providing specific and legitimate reasons supported by substantial evidence." *Garrison*, 759 F.3d at 1012 (quoting *Ryan*, 528 F.3d at 1198). "This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'" *Id.* (quoting *Orne v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)). Further, under the specific and legitimate reasons standard, the ALJ may disregard a treating physician's opinion when it is premised "to a large extent" on the claimant's properly discounted subjective complaints. *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (internal quotation marks omitted).

To satisfy the "substantial evidence" requirement of the specific and legitimate reasons standard, the ALJ should set forth a "detailed and thorough summary of the facts and conflicting clinical evidence, stat[e] his interpretations thereof, and mak[e] findings." *Garrison*, 759 F.3d at 1012 (citing *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (internal citation and quotation marks omitted). The ALJ can never arbitrarily substitute his own judgment over the opinion of competent medical professionals. *Tackett*, 180 F.3d at 1102–03.

Plaintiff argues the ALJ erred by failing to articulate specific and legitimate reasons for rejecting the opinions of the treating source, that of Dr. Jeffrey Evenson. ECF No. 17 at 13:3–17:12. Contrary to this assertion, the ALJ gave three specific and legitimate reasons for according little weight to Dr. Evenson's opinion and letter: (a) Dr. Evenson did not provide adequate support for his determination of Plaintiff's RFC; (b) Dr. Evenson's conclusions were contrary to the objective evidence and inconsistent with the treatment records as a whole; and, (c) Dr. Evenson's conclusions were contrary to Plaintiff's admitted activities of daily living. AR 26.

a.    The ALJ properly assigned little weight to Plaintiff's treating physician's opinion because the opinion offered inadequate support for Plaintiff's RFC.

The ALJ, when "determining a claimant's RFC, . . . must consider all relevant evidence in the record, including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) (citing SSR 96-8p, 1996 WL 374184, at *5 *accord* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3)).  An ALJ may disregard the treating physician's opinion when the opinion is premised "to a large extent" on the claimant's properly discounted subjective complaints.  *See Fair*, 885 F.2d at 605 (internal quotation marks omitted).  Here, the ALJ properly accorded little weight to Dr. Evenson's opinion because the opinion was primarily based on Plaintiff's properly discounted subjective complaints, and therefore, provided inadequate support for Dr. Evenson's RFC determination.

The ALJ cited a specific, legitimate reason for disregarding Dr. Evenson's opinion: "Dr. Evenson primarily summarized in the treatment notes the claimant's subjective complaints, diagnoses, and treatment, but he did not provide objective clinical or diagnostic findings to support the functional assessment." AR 26.  The ALJ therefore declined to adopt Dr. Evenson's assessment of Plaintiff's RFC, and instead adopted the RFC best supported by the objective evidence as a whole. AR 26.  This was consistent with the law and the substantial evidence in the record.  *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015) ("[T]he ALJ is responsible for translating and incorporating clinical findings into a succinct RFC."); *see also* AR 114, 725–28, 732–37.

b.    The ALJ properly assigned little weight to Plaintiff's treating physician's opinion because it was contrary to the objective evidence and inconsistent with the treatment records as a whole.

i.    *Plaintiff's treating physician's opinion is inconsistent with the objective medical evidence*

A medical opinion, including a treating physician's opinion, may be rejected if it is unsupported by medical findings. *Bray v. Comm'r Soc. Sec. Admin*, 554 F.3d 1219, 1228 (9th Cir. 2009).  In its Opposition, Defendant cites physical examinations (AR 830), objective imaging (AR 25), a cervical spine series (AR 759), a lumbar spine series (AR 760), a thoracic spine series (AR

761), a cervical spine MRI (AR 762), and a thoracic spine MRI (AR 764) taken of the Plaintiff which returned normal or unremarkable results.  ECF No. 20 at 4:8–19.  Defendant maintains that these medical findings are not "consistent with an opinion that Plaintiff is unable to engage in any physical activity."  *Id.* at 4:19–20 (internal citation omitted).

Plaintiff counterargues that the Commissioner cannot offer a post hoc rationale to fill in the gaps of the ALJ's inadequate analysis because the Court can only review reasons articulated by the ALJ.  ECF No. 24 at 4:22–23.  Indeed, it is "error for the district court to affirm the ALJ's credibility decision based on evidence that the ALJ did not discuss."  *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).  However, and contrary to Plaintiff's assertions, the ALJ relied on objective medical evidence demonstrating only moderate disability.  AR 24–26.

The ALJ cites to the following medical evidence in his findings:

- On July 18, 2013, "a chest x-ray . . . showed no active disease . . . cranial nerves II-XII were normal and . . .  no maxillary facial pain to palpation";

- On March 19, 2014, "a chest x-ray . . . was normal";

- On March 20, 2014, "[Plaintiff] reported . . . medication . . . always helped his head and neck pain"; "[p]hysical examination showed bilateral equal strength, [Plaintiff] had a nonfocal neurologic exam, normal mood and effect, and no significant change";

- On March 21, 2014, "a [CT] scan . . . was negative for fracture of static subluxation. . . .  A head CT scan revealed no acute intracranial process";

- On May 27, 2014, a "[m]usculoskeletal examination . . . revealed no cyanosis, clubbing or edema in the extremities, [Plaintiff] had normal range of motion and no gross deformities; . . . normal curvature of the spine; full range of motion; no misalignment or tenderness, normal stability, and normal strength and tone";

- On June 11, 2014, a "cervical spine x-ray . . . showed probable previous fusion at C3-C4; degenerative disk disease . . . present at C4-C5, C5-C6 and C6-7; multilevel degenerative facet arthropathy; . . . and stable osseous relationships. . . . A lumbar spine x-ray demonstrated no evidence of abnormal motion . . . ; mild facet arthropathy lumbosacral junction; and atherosclerotic vascular disease . . . .  Thoracic spine x-ray revealed multilevel degenerative disc disease, and no compression fracture . . . .  A cervical spine [MRI] test . . . identified a normal cervical lordosis; . . . mild mid cervical spondylosis; degenerative changes . . . at the C5-C6 level . . . ; . . . no significant canal stenosis; posterior facet and uncinate arthropathy contribut[ing] to mild bilateral neural foraminal narrowing; . . . prominent right-sided uncinate arthropathy . . . contribut[ing] to mild to moderate right neural foraminal narrowing without significant canal stenosis [at C4-C5]; . . . mild degenerative changes at the C6-C7 level; and the remaining levels were unremarkable . . . .

A thoracic spine MRI revealed no significant disc bulge/hesitation; there was no evidence central canal stenosis; and the foramina were patent";

- On June 26, 2014, an EMG/NCS test "showed evidence consistent with a right carpal tunnel syndrome otherwise it was a normal study of upper and lower extremities";

- On July 23, 2014, Plaintiff reported "trouble hearing when there is a lot of background noise," but also reported that his "dizziness had improved";

- On August 29, 2014, "[Plaintiff] had a negative Rhomberg test, and his gait was intact tandem, toe and heel walking";

- On September 19, 2014, an EMG "indicated evidence of . . . carpal tunnel syndrome . . . without ongoing denervation or reinnervation; . . . mild ulnar mononeuropathy across the elbow without denervation; prolonged left peroneal latency with reduced amplitude . . . ; and no evidence for a peripheral neuropathy, plexopathy ongoing radiculopathy or myopathy;

- On October 17, 2014, "[Plaintiff] reported he did not have dizzy spells since the past July";

- On March 11, 2015, "[a] cervical spine MRI revealed degenerative changes and no significant spinal canal stenosis";

- On March 18, 2015, "[a] lumbar spine discogram . . . revealed no pain and normal disc at L3-4 through L5-S1";

- On May 7, 2015, "cranial nerves 2-12 were within normal limits, neck flexion and extension were normal, the muscles had normal bulk and tone, no evidence of fasciculation, no pronator drift, and motor strength was 5/5 all over; sensory examination was intact to light touch and pinprick, joint position sense (propnoception and vibration; there was no ataxia or dysmetria of the upper and lower extremities, the finger to nose, hand rapid alternating movement and heel to shin test were intact bilaterally; deep tendon reflexes were symmetrical and 2+ throughout, plantar responses are flexor bilaterally; and gait had a negative Rhomberg test and intact tandem, toe and heel walking."; and,

- On November 19, 2015, Plaintiff reported undergoing "physical therapy and injections [yielding] 50% relief; however [Plaintiff's] pain was exacerbated when a nerve appeared to be contacted during injection[.]"

This overwhelming objective evidence is inconsistent with Dr. Evenson's opinion that Plaintiff is unable to engage in any physical activity. In fact, the objective evidence revealed only mild to moderate impairment. *Id.* Thus, Dr. Evenson's assessment of the most extreme possible limitations is simply inconsistent with substantial evidence to the contrary. Under these circumstances, the Court must affirm the decision of the Commissioner. *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001); *see also Andrews*, 53 F.3d at 1041.

ii.   *Plaintiff's treating physician's opinion is inconsistent with the treatment records as a whole*

All of Plaintiff's nontreating physicians opined upon independent clinical findings and, as such, must be viewed as substantial evidence that Plaintiff is not disabled. *Allen v. Heckler*, 749 F.2d 577, 580 (9th Cir. 1984) (internal citation omitted); AR 725–28, 732–37, 114–16. An ALJ is not required to make specific findings before rejecting a claimant's subjective allegation of pain when "nontreating physician[s] rel[y] on independent clinical findings that differ from the findings of the treating physician." *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir. 1985). "[T]o the extent that [the nontreating physician's] opinion rests on objective clinical tests, it must be viewed as substantial evidence that [the claimant] is no longer disabled." *Allen*, 749 F.2d at 580.

Here, Plaintiff's treating physician found a RFC that rendered Plaintiff totally disabled. AR 810–13. In comparison, all nontreating physicians, a total of four individuals, concluded Plaintiff had a far greater RFC. AR 114, 725–28, 732–37. Each of these nontreating physicians, therefore, found Plaintiff was capable of working in some capacity. The ALJ (as he is required to do) evaluated every medical opinion received according to a list of factors set forth by the Social Security Administration. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c). The factors set forth by the Social Security Administration include: (1) examining relationship; (2) treatment relationship; (3) supportability; (4) consistency; (5) specialization; and, (6) other factors. 20 C.F.R. §§ 404.1527(c)(1)–(6), 416.927(c)(1)–(6). Plaintiff claims the ALJ summarily disregarded "all the medical opinions in the record" and failed to consider them in assessing his RFC. ECF No. 17 at 16:18–26. The ALJ's findings reflect the opposite.

More specifically, the ALJ gave significant weight to the opinion of consultative examiner Dr. Simon Farrow, who opined that Plaintiff has "medium limitations." AR 26–27, *citing* AR 725–28. The ALJ evaluated Dr. Farrow's opinion based on the factors set forth by the Social Security Administration, finding that the opinion was "based on an in-person exam, the assessment is complete, specific facts are cited upon which the conclusion is based, and is largely consistent with the record as a whole." *Id*. The ALJ nevertheless assigned a more restrictive limitation to the Plaintiff's RFC than Dr. Farrow did, by giving "significant weight to the subjective complaints of

the claimant," leading to a finding that Plaintiff must work only with the light limitation.  AR 27.  The ALJ carefully considered Dr. Farrow's opinion and considered it in assessing his own RFC.

The ALJ also gave significant weight to the opinion of Dr. Lynn Larson who "opined the Plaintiff could do complex tasks and gave a questionable effort on psychological examination."  *Id.*, *citing* AR 732–37.  The ALJ evaluated Dr. Larson's opinion based on the factors set forth by the Social Security Administration, finding that the opinion was "based on an in-person exam, the assessment is complete, specific facts are cited upon which the conclusion is based, and is substantially consistent with the record as a whole."  *Id.*  The ALJ clearly considered Dr. Larson's opinion and considered it in rendering a decision regarding Plaintiff's RFC.

The ALJ gave great weight to the opinions of State agency review physicians Dr. George Nickles and Dr. Ryuichiro Torigoe.  *Id.*  The regulations in effect at the time of the ALJ's decision state that:

> [f]indings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the administrative law judge . . . level[] of administrative review.  Administrative law judges . . . may not ignore these opinions and must explain the weight to these opinions in their decisions.

SSR 96-6p (eff. until March 27, 2017).  This is because "[s]tate agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act."  *Id.*  These physicians provided a detailed assessment of longitudinal medical evidence, concluding that Plaintiff could perform a significant range of light work activity.  AR 27, *citing* AR 114–16.  The ALJ explained that he gave great weight to the State agency review physicians' "current and comprehensive" opinion because Dr. Nickles and Dr. Torigoe accessed and reviewed the entire medical record.  *Id.*  Thus, the ALJ clearly considered the State agency review physician's opinions and considered them in assessing his own RFC.

Plaintiff argues Dr. Enrico Fazzini's opinion supports Dr. Evenson's opinion finding Plaintiff "is not capable of performing even low stress work in a competitive environment and/or sustaining full-time competitive work."  ECF No. 17 at 15:24–16:6.  But, a review of the evidence shows this

is not an accurate statement.  Dr. Evenson stated Plaintiff could not perform any physical activities whatsoever; whereas, Dr. Fazzini stated only that Plaintiff was "moderately disabled."  AR 360. Further, the ALJ accounted for Dr. Fazzini's observations of Plaintiff's "muscle spasms, spinal tenderness, and some reduced spinal ranges of motion" (AR 339) by finding a severe spinal impairment (AR 22) and limiting Plaintiff to no more than a limited range of light work (AR 23). The ALJ therefore properly translated Dr. Fazzini's "moderately disabled" determination into an RFC statement.  *Rounds*, 807 F.3d at 1006.

Based on the totality of the record and the ALJ's carefully documented record, the ALJ properly accorded little weight to Dr. Evenson's opinion because it was inconsistent with Plaintiff's treatment records as a whole.

> c.  The ALJ properly assigned little weight to Plaintiff's treating physician's opinion because it was contrary to Plaintiff's admitted activities of daily living.

An ALJ may discount a medical source opinion, including a treating source's opinion, to the extent it conflicts with the claimant's daily activities.  *Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 601–02 (9th Cir. 1999).  In this case, at his administrative hearing, Plaintiff stated that he served as a live-in caregiver to an 85-year-old woman by helping her with "things that she needed to do around the house that she couldn't do physically," including "heavy lifting and stuff like that."  AR 42.  Plaintiff testified that he cooks (albeit only for himself), drives, does his own laundry, and can wash "one dish."  AR 46–48.  As the Commissioner points out, "this range of daily activity is clearly not performable by someone who purportedly could stand for '0 minutes' at one time, who could never lift any weight, and who could perform '0%' handling, fingering, or any form of reaching (AR 811–12)."  ECF No. 20 at 5:4–6 (internal citation omitted).  Given Plaintiff's testimony, the ALJ correctly found Dr. Evenson's opinion should be accorded little weight, because it was contrary to Plaintiff's admitted activities of daily living.

## 2.   The ALJ's Consideration of Plaintiff's Subjective Complaints

The ALJ must engage in a two-step analysis when evaluating a claimant's testimony concerning pain, symptoms, and level of limitation is credible.  *Garrison*, 759 F.3d at 1014.  First, "the ALJ must determine whether the claimant has presented objective medical evidence of an

underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  Second, if there is no evidence of malingering, "the ALJ can reject the claimant's testimony concerning the severity of his symptoms only by offering specific, clear and convincing reasons for doing so."  *Garrison*, 759 F.3d at 1014–15 (internal citation omitted).  An ALJ's finding on this matter must be properly supported by the record and sufficiently specific to ensure a reviewing court that the ALJ did not "arbitrarily discredit" a claimant's subjective testimony.  *Thomas v. Barnhart*, 278 F.3d 948, 958 (9th Cir. 2002) (citation omitted).

In weighing a claimant's credibility for cases involving ALJ decisions rendered prior to March 24, 2016, the ALJ may consider Plaintiff's reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains.  *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).  However, a claimant's statements about his pain or other symptoms alone will not establish that he is disabled.  20 C.F.R. § 416.929(a)(1); 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability.").  A claimant is not entitled to benefits under the Social Security Act unless the claimant is, in fact, disabled, no matter how egregious the ALJ's errors may be.  *Strauss v. Comm'r Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011).

Here, Plaintiff argues the ALJ erred by failing to articulate clear and convincing reasons for discounting Plaintiff's subjective complaints.[7]  ECF No. 17 at 17:14–22:18; ECF No. 24 at 6:10–12 ("It is not sufficient for the ALJ to make only general findings; he must state which pain testimony

---

[7]        In its Cross-Motion to Affirm and Opposition to Plaintiff's Motion to Remand, Defendant "maintains that [the clear and convincing reasons] standard is inconsistent with the deferential substantial evidence standard . . . and with agency regulations and rulings specifying the rationale its adjudicators should provide in support of their findings."  ECF No. 20 at 7, n.7 (citing 20 C.F.R. § 416.927; SSR 96-2p).  Notwithstanding, the Ninth Circuit has employed the clear and convincing reasons standard when reviewing an ALJ's decision to discredit a claimant's allegations.  *See Burrell v. Colvin*, 775 F.3d 1133, 1136–37 (9th Cir. 2014); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014); *Robbins*, 466 F.3d at 883.  This Court is bound to follow Circuit precedent.  *See Bell v. Hill*, 190 F.3d 1089, 1093 (9th Cir. 1999) ("[W]e and the district courts in this circuit must follow controlling circuit court precedent. . . .") (internal citation omitted).

1  is not credible and what evidence suggests the complaints are not credible.") (internal citation
2  omitted).  In contrast to Plaintiff's assertions, the ALJ found Plaintiff's medically determinable
3  impairments could reasonably be expected to cause the alleged symptoms at step one of the *Garrison*
4  analysis.  AR 24.  At step two, however, the ALJ found Plaintiff's statements concerning the
5  intensity, persistence and limiting effects of these symptoms were not entirely credible for three
6  reasons.  AR 23–24.  The ALJ found: (a) Plaintiff received "routine, conservative and non-
7  emergency treatment since the alleged onset date"; (b) Plaintiff's alleged loss of function was not
8  supported by objective medical findings; and, (c) Plaintiff admitted engaging in a "somewhat normal
9  level of daily activity and interaction" despite his alleged impairment.  AR 24.

10            a.      The ALJ erred in discounting Plaintiff's credibility based on his alleged
11                    history of conservative treatment, but this error was harmless.

12          The ALJ discounted Plaintiff's subjective testimony because Plaintiff had "not generally
12  received the type of medical treatment one would expect for a totally disabled individual. . . .  The
13  treatment records reveal the claimant received routine, conservative and non-emergency treatment
14  since the alleged onset date."  AR 24.  "Evidence of 'conservative treatment' is sufficient to discount
15  a claimant's testimony regarding the severity of an impairment."  *Parra v. Astrue*, 481 F.3d 742, 751
16  (9th Cir. 2007) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995)).

17          The medical evidence reveals that Plaintiff's treatment consisted of prescribed medications.
18  AR 303–09, 313, 389–91, 827, 848.  Plaintiff previously told his provider that medications "always
19  helps his neck and head pain."  AR 513.  While "[s]uch a response to conservative treatment
20  undermines [Plaintiff's] reports regarding the disabling nature of his pain," (*Tommasetti v. Astrue*,
21  533 F.3d 1035, 1040 (9th Cir. 2008)), Plaintiff's prescribed medications were not over-the-counter
22  medications available to the general population. Therefore, Plaintiff's medication regimen does not
23  constitute conservative treatment.[8]  *Cf. Parra*, 481 F.3d at 746 (treating alleged disability with an
24  over-the-counter pain medication is evidence of conservative treatment sufficient to discount a
25  claimant's testimony regarding the severity of an impairment) (citation omitted).

---

[8]      Plaintiff's medications consist of, among others: Oxycodone (AR 303, 305–08); Diazepam (AR 304, 306–08, 313); and, Percocet (AR 313, 848).

27

1    Plaintiff's treatment also consisted of rehabilitative physical therapy.  AR 373–31, 906–66.

2    The Ninth Circuit has questioned whether physical therapy can be classified as conservative

3    treatment.  *Garrison*, 759 F.3d at 1015.  Further, the Court acknowledges that the Plaintiff decided

4    to proceed with ACDF surgery at C4-5 and C5-6 levels.  AR 1151.  "Surgery is not conservative

5    treatment."  *Loban v. Prudential Ins. Co. of Am.*, 262 F. App'x 793, 794 (9th Cir. 2003).

6    Additionally, Plaintiff received "transforaminal epidural steroid injections, antibiotic injections into

7    the lumbar spine, and medial branch blocks."  ECF No. 17 at 21:22–24, *citing* AR 1083, 1092, 1098,

8    1122.  The Ninth Circuit has cast doubt on characterizing epidural injections as conservative

9    treatment.  *Garrison*, 759 F.3d at 1015.

10   The above establishes that the Court finds the ALJ erred in discounting Plaintiff's credibility

11   on the basis of alleged conservative treatment.  Although the ALJ erred in this respect, the error was

12   harmless because the ALJ cited two valid, sufficiently supported reasons for his ultimate conclusion

13   that the claimant's symptoms and complaints should be discounted.  *Stout*, 454 F.3d at 1055 (finding

14   harmless error when it was inconsequential to the ultimate nondisability determination).

15   Specifically, the ALJ properly discounted Plaintiff's credibility based on a lack of objective medical

16   evidence, and conflicts between Plaintiff's testimony and his reports of daily living.

17       b.    The ALJ properly discounted Plaintiff's credibility based on conflicts
              between his testimony and the objective medical evidence.

18   In determining the extent of Plaintiff's symptoms, the ALJ must consider whether there are

19   any conflicts between Plaintiff's statements and the objective medical evidence.  20 C.F.R. §

20   416.929(c)(4).  In order to find a plaintiff not credible, "the ALJ must rely either on reasons unrelated

21   to the subjective testimony (e.g. reputation for dishonesty), on conflicts between his testimony and

22   his own conduct, or on internal contradictions in that testimony."  *Light v. Soc. Sec. Admin.*, 119

23   F.3d 789, 792 (9th Cir. 1997).  Here, as explained below, the ALJ discounted Plaintiff's credibility

24   because "the [Plaintiff's] alleged loss of function is not supported by the objective medical findings."

25   AR 24.

26   Specifically, the ALJ found the objective medical findings, listed above, were inconsistent

27   with Plaintiff's allegations regarding the severity of his symptoms and limitations and, therefore,

28

28

discounted Plaintiff's credibility.  AR 24–26.  The ALJ's findings are supported by substantial objective medical evidence revealing, among others, "no active disease"; a "normal" chest x-ray; "normal range of motion and no gross deformities"; "normal curvature of the spine"; "full range of motion, no misalignment or tenderness, normal stability, and normal strength and tone"; "normal . . . upper and lower extremities"; "normal" neck flexion and extension, "muscles [with] normal bulk and tone," and, "negative Rhomberg test and intact tandem, toe and heel walking." *Id.*  Plaintiff argues that "[w]hile an ALJ may find testimony not supported in part or in whole, he or she may not disregard it *solely* because it is not substantiated affirmatively by objective evidence."  ECF No. 17, at 19:16–19 (internal citation omitted) (emphasis added).

Plaintiff's argument is unavailing because the ALJ cites an additional reason, supported by clear and convincing reasons, for discrediting Plaintiff's credibility.  That is, the ALJ properly discounted Plaintiff's credibility on the basis that no objective medical evidence existed to support his testimony, and found that Plaintiff's testimony was inconsistent with his reports of daily living.  AR 24–26.

> c. <u>The ALJ properly discounted Plaintiff's credibility based on conflicts between his testimony and his reports of daily living.</u>

The ALJ may consider a claimant's activities that undermine reported symptoms.  *Rollins*, 261 F.3d at 857.  If a claimant can spend a substantial part of the day engaged in pursuits involving the performance of exertional or non-exertional functions, the ALJ may find these activities inconsistent with the reported disabling symptoms.  *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012).  "While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discount a claimant's symptom claims when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting" or when activities "contradict claims of a totally debilitating impairment." *Id*. at 1112–13.  Here, as discussed in greater detail above, Plaintiff admitted activities of daily living, including driving, cooking, doing laundry, doing a dish at a time, reading, and watching television.  AR 24.  Plaintiff's reported daily activities therefore contradict claims of total disability.

Plaintiff argues that the "ALJ has failed to adequately explain how Klug's limited activities translate into the ability to perform work on a full-time, competitive basis." ECF No. 17 at 21:3–4. At his administrative hearing, Plaintiff testified that he has "struggled . . . to get back on [his] feet again" after quitting his business to take care of his father. AR 44. Giving depth to this statement, however, Plaintiff conceded that he had a "motivation problem" back then and was "just . . . happy to survive." AR 56. Moreover, Plaintiff testified that he did not "really tr[y]" to reenter the workforce until after Social Security initially denied his disability claim. *Id*. The Ninth Circuit has previously held that an ALJ properly discredited claimant's testimony regarding his pain and limitations, in part, because the claimant did "not possess the motivation to do more" and "restrict[ed] activities of daily living [as] a lifestyle *choice*." *Osenbrock v. Apfel*, 240 F.3d 1157, 1166 (9th Cir. 2001) ("[T]o the extent that the claimant's activities of daily living are limited, they are *self*-limited."). That reasoning is clearly applicable.

The Court therefore finds the ALJ articulated clear and convincing reasons for rejecting Plaintiff's credibility based on conflicts between his testimony and reports of daily living.

## IV.    RECOMMENDATION

The ALJ demonstrated, using the specific and legitimate standard, that Plaintiff's treating physician's opinion should be rejected because (a) the opinion provided inadequate support for Plaintiff's residual functional capacity; (b) the opinion was contrary to the objective evidence and inconsistent with the treatment record as a whole; and, (c) the opinion was contrary to Plaintiff's admitted activities of daily living. While the ALJ failed to demonstrate that Plaintiff's subjective complaints should be discounted because there was a lack of objective medical evidence, this error was harmless. The ALJ demonstrated, using the clear and convincing standard, that Plaintiff's credibility should be discounted because there was a lack of objective medical evidence to support his allegations of disability, and Plaintiff engaged in daily activities inconsistent with his allegations of disability.

Accordingly,

IT IS HEREBY RECOMMENDED that Plaintiff's Motion for Reversal and Remand (ECF No. 17) be DENIED, and that the Defendant's Cross Motion to Affirm (ECF No. 24) be GRANTED.

IT IS SO ORDERED.

DATED this 4th day of November, 2019.

ELAYNA J. YOUCHAH
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).